# IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| JENNIFER MONDELLO, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ICF TECHNOLOGY, INC., ACCRETIVE TECHNOLOGY GROUP, INC.,<br><br>Defendants. | Civil Action No.: 8:24-cv-01037 |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR CONDITIONAL CERTIFICATION PURSUANT TO 29 U.S.C. § 216(b)**

## I.  INTRODUCTION

Plaintiff Jennifer Mondello ("Plaintiff") is an independent, freelance performer on the internet. She alleges that Defendants ICF Technology, Inc. and Accretive Technology Group, Inc. (together, "Defendants") "misclassified" her and other Florida-based performers as "independent contractors" who use the livestream and content host website Streamate.com ("Streamate"). She seeks wages under the Fair Labor Standards Act ("FLSA") and Florida law.  Plaintiff served the operative amended complaint ("Complaint") on June 12, 2024 (ECF No. 12)[1] and filed her Motion for Conditional Certification ("Motion") on October 11, 2024 (ECF No. 33).

Plaintiff's Motion should be denied in its entirety because she has failed to adequately demonstrate that there are other performers who desire to opt in and she has failed to demonstrate that other performers are similarly situated to herself.

## II.  BACKGROUND

**A.  The Streamate website**.

Defendant ICF operates Streamate.com, a website that serves as a host for livestreaming and other content for adult-oriented independent, freelance performers. ECF No. 21, Defs.' Answer to Am. Compl. ¶ 9. Before accessing Streamate or uploading or streaming any content, each freelance performer must "register" for the website and execute a "Performer Agreement." *Id.* at ¶ 19. As part

---

[1] Plaintiff initiated this action by filing a Complaint on April 30, 2024 (ECF No. 1).

of the website registration process, ICF reviews a performer's application materials to certify that the performer is an eligible performer—*e.g.*, residence and age confirmations. Declaration of Elizabete Rekevics in Support of Defendants' Opposition to Plaintiff's Motion for Conditional Certification Pursuant to 29 U.S.C. § 216(b) ("Rekevics Decl.") at ¶ 3.

The Streamate website has areas that are free to access for age-verified customers. Rekevics Decl. at ¶ 4. These areas are referred to as "free" because there is no mandatory payment scheme; customers are not required to pay per minute or per show. *Id.* at ¶ 5. Importantly, however, a performer is able to generate earnings during time spent in free chat, including customer Gold[2] payments, subscription payments, or other content purchases. *Id*. *See also* Declaration of K.F. ("K.F. Decl.") at ¶ 5[3] ("In free chat, I earn money by using the Gold wheel and the Gold Menu.") and Declaration of M.D. ("M.D. Decl.") at ¶ 5 ("I still generate significant earnings in free chat"). A performer can earn Gold in the "free chat" area by using a Gold Menu, a "spin the wheel" program, and interactive sex toy options. *See* Rekevics Decl. ¶ 5 (describing the options). Moreover, each performer can require customers

---

[2] Plaintiff inaccurately refers to Gold as a "tip"; it is actually a virtual currency. *See* ECF No. 12 at ¶ 37. Customers exchange non-virtual currency for Gold and customers exchange $1.00 for one Gold and use the Gold on Streamate. *See* Rekevics Decl. at ¶ 5, n. 1.

[3] Due to the unique confidentiality considerations of putative class members in this case, the performers' names are redacted on their declarations, and only their first and last initials are available in public filings. *See Manasco v. Best In Town, Inc.*, Case No. 2:21-cv-00381, 2022 WL 816469, *3 (N.D. Ala. March 17, 2022).

to pay a certain amount of Gold before the performer grants access into "paid" areas, where verified customers pay the performer either a time-based or flat rate to view a performance which may include below the waist nudity. *Id.* at ¶ 6.

**B.    Performer Agreements.**

A "Performer Agreement" is a written document establishing the terms and conditions of each performer's use of the Streamate platform. *See* Declaration of Michael Kitson ("Kitson Decl.") Ex. A, Streamate Performer Agreement (Mar. 1, 2024) ("Performer Agreement (2024)").  These terms and conditions interpret and reiterate certain legal requirements universally applicable to any performer or host of adult content in the United States. *See* Kitson Decl. Ex. G, Transcript Excerpts from Deposition of Katrina Glogowski ("Glogowski Tr.") at 64:3-5 ("I would say every rule stems from a legal requirement.").

For example, consistent with various federal and state laws, the current Performer Agreement bans the involvement or depiction of children (Performer Agreement (2024) at Sections K.1 and K.3); bans prostitution and sex trafficking (*id.* at Section K.2); requires verification of content providers (*id.* at Section K.9); bans illegal conduct, content, and fraudulent activity (*id.* at Sections K.3 and K.8); bans below-the-waist nudity in free areas, subject to age verification (*id.* at Section K.4); bans the involvement or depiction of animals (*id.* at Section K.7); and forbids intoxication or the use of drugs or alcohol during performances (*id.* at Section K.6).

These rules are required or informed by federal, state, and local laws that apply to any content host on the Internet, particularly those that permit adult content. *See* Kitson Decl., Ex. G, Glogowski Tr. at 63:8-14 ("For example in America the United States, 18 U.S. Code § 2258 says no minors. That is not [] Streamate's rule - that is a Federal Government rule."). Indeed, other sites that host adult content impose similar restrictions. *See, e.g.,* Kitson Decl. Ex. B, OnlyFans Acceptable Use Policy at Section 5 (accessed October 31, 2024) (banning a variety of content for legal compliance reasons, *e.g.*, firearms, drugs, incest, bestiality, violence). Stated differently, regardless of whether a performer utilizes Streamate or any other online streaming platform (adult-oriented or not) to broadcast themselves on the Internet, a performer based in the United States will be subject to these legal restrictions. From there, **and importantly for purposes of their status as independent contractors, each and every freelance performer is free to use the platform on their own terms—streaming whatever *legal* content they want, whenever they want to do so, for as long or little as they want to do so, at prices they set, within the broad parameters provided by Defendants**. *See* Kitson Decl. Ex. A, Performer Agreement (2024) at DEF_FL_000496-504; Rekevics Decl. at ¶¶ 7-8.

The Performer Agreement also explicitly states: "**[Streamate] do[es] not have any control over or the right to control the means, manner or details regarding any of your performances**, if you satisfy the conditions stated herein

regarding your performances." Kitson Decl. Ex. A, Performer Agreement (2024) at Section M (emphasis added); *see also* Rekevics Decl. at ¶¶ 7-8.

## C. Each individual performer can stream from almost any location with Internet access.

Each performer is allowed to access and perform on the Streamate website from virtually any location with Internet access.[4] Rekevics Decl. at ¶ 9. Generally, each performer will provide a "residence" to Streamate upon initial registration to the website, but Defendants do not monitor a performer's residences or restrict a performer from streaming from locations other than their listed residence unless required by law to do so (e.g., local law or sanctions). *Id*. For example, Plaintiff Mondello appears to have consistently streamed from Florida, but declarant Mia Tomasello has streamed from Florida, New Jersey, and other locations. *Id.*

## D. Many performers in the putative class are compensated at a rate higher than minimum wage.

Many Streamate performers in the putative collective generate significant earnings through their Streamate performances. On a weekly basis, these earnings far exceed the federal minimum wage.[5] *See* K.F. Decl. ¶ 4 ("My average earnings

---

[4] There are limited locations where Streamate access may be blocked based on local laws, regulations, or other business decisions that are not relevant to Ms. Mondello or the putative class. Kitson Decl., Ex. G, Glogowski Tr. at 46:8-23.

[5] https://www.dol.gov/general/topic/wages/minimumwage#:~:text=The%20federal%20minimum%20wage%20for,of%20the%20two%20minimum%20wages. (accessed October 26, 2024).

her hour range from $20 to $100) and M.D. Decl. ¶ 4 ("earn approximately $200 per hour").

### E.    Some performers in the putative collective are subject to Performer Agreements containing mandatory arbitration clauses.

Defendants regularly update the Performer Agreement, and some versions of the Performer Agreement contain a mandatory arbitration clause that would preclude certain performers/putative class members from joining a class or collective action. Rekevics Decl. ¶ 10. Specifically, from April 1, 2020 through September 14, 2021 (which is during the relevant period in Plaintiff's Complaint), Streamate's Performer Agreements had both (1) a mandatory arbitration clause (subject to AAA rules) and (2) a waiver of class and collective arbitration actions. *See id.* Plaintiff Ms. Mondello is not subject to arbitration because she executed a version of the Performer Agreement without an arbitration provision.

## II.  LEGAL STANDARD

Ms. Mondello asks this Court to conditionally certify a collective of "[a]ll current and former individuals who work or have worked as Performers for [Defendants] in the State of Florida at any time three (3) years prior to the entry of the Order granting conditional certification, and who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b)" ECF No. 33 at 1.

"[T]o maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated." *See Anderson v. Cagle's,* 488 F.3d 945,

952 (11th Cir. 2007). The Eleventh Circuit has "sanctioned a two-stage procedure for district courts to effectively manage FLSA collective actions in the pretrial phase." *Morgan v. Family. Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008). During the first stage – the conditional certification or notice stage, "the Court should initially determine whether there are other employees who desire to opt into the action and whether the employees who desire to opt in are similarly situated." *Reyes v. Strada Services, Inc.*, Case. No. 8:21-cv-976-VMC-TGW, 202 WL 4427079, at *2 (Sept. 27, 2021) citing *Morgan*, 551 F.3d at 1359. A plaintiff has the burden of showing a "reasonable basis" for the claim that there are other similarly situated employees. *See Reyes* 2021 WL 4427079, at *2. "[W]hile the plaintiff's 'burden at the notice stage is not heavy, *it is not invisible*." *Reyes*, 2021 WL 4427079, at *3 (emphasis added) (citing *Morgan*, 551 F.3d at 1261).

### III. <u>LEGAL ARGUMENT</u>

**A.     FLSA Conditional Certification Does Not Require Judicial Prioritization or Special Expediency**.

Plaintiff requests that her "time-sensitive Motion" be adjudicated "as soon as practicable." ECF No. 33 at 3. However, despite the fact that, as she notes, Plaintiff's counsel are litigating a virtually identical matter in New Jersey, it has taken Plaintiff *six months* from the date she first filed her Complaint to file this motion with the Court. Plaintiff cites no controlling case law to support the position that this Court must act more rapidly on this motion than any other motion before it,

and accordingly, to the extent Plaintiff's Motion requests an "expedited" decision on conditional certification, such request is inappropriate and should be denied.

### B. Plaintiff Has Not Adequately Demonstrated There Are Other Performers Who Desire To Opt-In To This Action.

This Court must satisfy itself that there are other employees who desire to opt-in to this action. "Evidence of similarly situated employees who desire to opt in may be based on affidavits of other employees, consent to join the lawsuit filed by other employees, or expert evidence on the existence of other similarly situated employees." *Reyes*, 2021 WL 4427079, at *2 (quoting *Hart v. JPMorgan Chase Bank, N.A.*, No. 8:12-cv-470, 2012 WL 6196035, at *4 (M.D. Fla. Dec. 12, 2012)). "Certification of a collective action and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit." *Bobersky v. Indus. Energy Servs., Inc.*, No. 3:10CV197, 2010 WL 11640117, at *2 (N.D. Fla. Dec. 15, 2010) (quoting *Vondriska v. Premier Mortg. Funding, Inc.*, 564 F. Supp. 2d 1330,1334 (M.D. Fla. 2007)) (emphasis in original). "Rather, a showing that others desire to opt in is required before certification and notice will be authorized by the court." *Id.*

Despite the passage of six months of time between the filing of her initial Complaint and the filing of this motion, and after propounding discovery on Defendants, Plaintiff has provided a declaration from only **one** other performer who wants to opt-in to this action. Additionally, this performer is the named plaintiff in

a virtually identical action in New Jersey, and thus she was already known to Plaintiff's counsel prior to the commencement of this action. The lack of affidavits from any Florida performers not previously known to Plaintiff's counsel six months after filing the initial complaint and after some discovery has been completed is evidence that Plaintiff cannot demonstrate that there are other performers who want to opt-in to this action. This Court should find that Plaintiff has not met her burden to show that other performers desire to opt-in to this action. *See Barten v. KTK & Associates, Inc.*, No. 8:06-CV-1574, 2007 WL 2176203, *3 (M.D. Fla. July 26, 2007) ("In the eleven months since this lawsuit was filed, Plaintiffs have identified only one viable opt-in plaintiff … Plaintiffs' allegations are simply not sufficient to establish that there are other individuals who would join this action").

C. **Plaintiff Has Not Demonstrated That Other Performers Are Similarly Situated To Her.**

  1. Plaintiff has not produced sufficient evidence that all members of the putative collective have sufficient minimum contracts to Florida to establish this Court's personal jurisdiction over them.

According to at least one district court in this Circuit, this Court does not have personal jurisdiction over opt-ins in the putative collective who stream from outside of Florida. *See Brown v. MUT Pizza-Tejas, LLC*, Case No. 1:23-cv-1816, 2024 WL 3489201, *4 (N.D. Ga. July 18, 2024). Accordingly, each potential opt-in plaintiff for the collective action must establish that their claim arises out of Defendants' minimum contacts with Florida (*i.e.*, only those instances where the use of

Defendants' platform occurred in Florida). Thus, the potential opt-in plaintiffs will be limited to only those performers who streamed, produced, uploaded, or otherwise provided content on Streamate from a location in Florida.

However, determining which performer allegedly "worked" through streaming, producing, uploading, or otherwise providing content on Streamate in Florida is not an insignificant task. This Court will need to ensure that each putative plaintiff—including the named Plaintiff—has sufficient contacts with Florida to meet the standard articulated in *Brown*. To the extent a performer is identified as "working in Florida," the analysis will be unique and individualized to each performer because a performer can perform virtually anywhere with internet access. Indeed, the one declaration of a putative opt-in is from a performer **who has also streamed from outside Florida**. Conditional certification at this stage is not appropriate due to this Court's lack of jurisdiction over putative collective members.

2. <u>Declarations from Florida performers demonstrates that not all performers are similarly situated to Plaintiff.</u>

Plaintiff asserts that "common issues of law and fact shared by Plaintiff and other performers indicate they are similarly situated." ECF No. 33, Pl. Mem. at 15. However, Plaintiff's situation relative to other putative collective members is not similar, and declarations from other individual performers demonstrate that Ms. Mondello's allegations about the amount of control allegedly exerted by Streamate

on her own use of the site are not typical of, and are in fact materially different from, other putative collective members. For example:

- Ms. Mondello asserts that "Defendants exert significant control over my streams through the Agreement." ECF No. 33-5, Declaration of Jennifer Mondello ("Mondello Decl.") ¶ 3.

  - In contrast, performers have testified that Streamate has never told them where, how or when to perform. K.F. Decl. ¶¶ 6-8; M.D. Decl. ¶¶ 6-8.

- Ms. Mondello claims that "[t]he Agreement provides strict rules on what I may and may not do during a stream." Mondello Decl. ¶ 4.

  - Performers have stated that as long as they comply with the rules, they can do whatever they want when they stream. K.F. Decl. ¶ 13; M.D. Decl. ¶ 6.

- Ms. Mondello asserts that "[t]he Agreement sets forth what equipment, which I must purchase, may be used during my streams." Mondello Decl. ¶ 8.

  - Performers have contradicted this statement by testifying that Streamate did not require them to purchase a specific brand or type of equipment. K.F. Decl. ¶ 10; M.D. Decl. ¶ 9.

- Ms. Mondello alleges that she "was only paid for the time [she] performed in 'paid chats'." Mondello Decl. ¶ 10.

  - Performers can earn money in "free chat" by, among other methods, using the Gold wheel and the Gold Menu. K.F. Decl. ¶ 5; M.D. Decl. ¶ 5.

These demonstrated dissimilarities between Ms. Mondello and other members of the putative collective is fatal to Plaintiff's Motion because she cannot assert a reasonable basis for her claim that there are other similarly situated performers. It is improper to certify the collective because Plaintiff's alleged experience on the platform is dissimilar from that of the other putative collective members.

  3. <u>Plaintiff's mischaracterization of the performer agreement is not evidence of a collective of similarly situated individuals.</u>

The Performer Agreement included in Plaintiff's Motion does not impose the "control" over performers that Ms. Mondello alleges it does. *See* Mondello Decl. ¶ 3. The Agreement prohibits behavior that is criminal in nature (*e.g.*, performances involving minors, prostitution, and sex trafficking). Beyond those parameters, however, each performer has full control over what they actually do on Streamate. Neither the Performer Agreement nor Defendants exert control over the nature or type of performance, as long as it does not violate the law. Indeed, even if a person never signed the Performer Agreement and never performed once on Streamate, they would still be bound to abide by the few restrictions in the Performer Agreement because they reflect legal prohibitions, not arbitrary policies of Defendants. *See, e.g.*, *Ruiz v. Affinity Logistics Corp.*, 697 F. Supp. 2d 1199, 1206 (S.D. Cal. 2010) (acknowledging compliance with federal regulations, without more evidence, may not sufficiently establish employer-employee control); *ARA Leisure Servs., Inc. v. NLRB*, 782 F.2d 456, 461 (4th Cir. 1986) ("Courts have recognized that controls imposed by an employer to ensure compliance with governmental regulations do not evidence an employee-employer relationship unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control.") (citation and internal quotation marks omitted).

Ms. Mondello's assertions that the Performer Agreement imposes control on

her are simply not reflected in the language of the Agreement nor Defendants' practices. Plaintiff asserts that "ICF has full control in determining what is and what is not allowed while a Performer is streaming and performing." Pl. Mem. at 4-5. This gross overstatement does not reflect either the Performer Agreement or Defendants' actual practice: performers are *not required to engage in any particular conduct or provide any particular content*. Plaintiff asserts that "[t]he common Agreement also restricts Plaintiff and the FLSA Collective members from promoting on any non-Streamate related websites." Pl. Mem. at 6. However, the Agreement explicitly states that "Performer has the right to work with other websites during the term of this Agreement and is not obligated to devote full-time efforts in generating revenue using our website. . . . Performer is allowed to own and operate a personal website." ECF No. 33-4, DEF_FL_000502. The only restriction is not performance-related: the rule merely protects from the misuse of Defendants' resources to advertise, market, or solicit for competitors. Furthermore, Plaintiff claims that "Defendants also require that Plaintiff and the FLSA Collective purchase certain equipment, including a computer, a webcam and an internet connection" and that "Plaintiff and the FLSA Collective are also required to purchase their own costumes and props." Pl. Mem. at 6 (ECF No. 33). The Agreement states that performers will "use [their] own equipment or tools in conducting . . . business," (ECF No. 33-4, DEF_FL_000501), but there is no requirement to purchase any particular costumes,

props, or equipment (besides a generic need for streaming-capable technology).

Courts in this District find this type of argument insufficient to sustain a plaintiff's burden at this stage of a conditional certification motion. "The mere anticipation that others may want to join the lawsuit *or the mere presence of a uniformly adverse compensation policy* is insufficient by itself." *Bobersky,* 2010 WL 11640117, at *2 (cleaned up and emphasis added). Here, Plaintiff has failed to meet her burden of establishing that putative collective members are similarly situated because the agreement and practices allow performers great latitude in their individual performances.

Additionally, Plaintiff's reliance upon cases involving "exotic dancers" is inapposite to this case.[6] The factual circumstances of the cases cited by Plaintiff in her brief are significantly different from the facts of this case. *See* ECF No. 33 at 12-14. The exotic dancer cases involve individuals who perform at a fixed, physical location (*Woods v. Club Cabaret, Inc.*, 140 F. Supp. 3d 775, 782 (C.D. Ill. 2015)); the dancers' schedules are set and mandated by the clubs and dancers have no control over customer flow (*Doe v. Banc, Jack & Joe, LLC*, No. 17-cv-03843, 2020 WL 2832621, at *2 (D.N.J. June 1, 2020); *Woods*, 140 F. Supp. 3d at 778; *Guzman v.*

---

[6] Plaintiff's reliance upon *Henderson v. 1400 Northside Drive, Inc.*, 110 F.Supp.3d 1318, 1321-22, 1324 (N.D. Ga. 2015) is inapposite because in that case the plaintiffs never asked the Court to make a legal determination regarding their "employee" status and the Court made no such determination. At issue in that case was whether the performers qualified for the creative professional exemption. *Id.*

*Three Amigos SJL, Inc.*, 117 F. Supp. 3d 516, 521 (S.D.N.Y. 2015); *Schofield v. Gold Club Tampa, Inc.*, 19-CV-3097, 2021 WL 533540 at *5-6 (M.D. Fla. Feb. 12, 2021); *Harrell v. Diamond A. Entm't, Inc.*, 992 F.Supp. 1343, 1349-1350 (M.D. Fla. 1997) ); the clubs dictate minimum work times for dancers (*Doe*, 2020 WL 2832621, at *2; *Woods*, 140 F. Supp. 3d at 778; *Guzman*, 117 F. Supp. 3d at 521); the clubs impose mandatory fees and penalties for missed or late shifts (*Doe*, 2020 WL 2832621, at *2; *Woods*, 140 F. Supp. 3d at 778; *Guzman*, 117 F. Supp. 3d at 521); the clubs have detailed rules regarding clothing, hair, makeup and other aspects of appearance (*Doe,* 2020 WL 2832621, at *2; *Woods,* 140 F.Supp. 3d at 778; *Guzman,* 117 F. Supp. 3d at 520-521; *Manasco v. Best in Town, Inc.*, 21-CV-00381, 2023 WL 5963434 at *4 (N.D. Ala. Sept. 13, 2023); *Harrell*, 992 F.Supp. 1343 at 1349-1350); and the scheduling requirements established by the club mandate a certain number of dances or songs or time spent in certain activities (*Doe*, 2020 WL 2832621, at *2; *Woods*, 140 F. Supp. 3d at 779; *Guzman*, 117 F. Supp. 3d at 521; *Burgos v. Emperor's Tampa, Inc.*, 713 F.Supp.3d 1246, 1250 (M.D. Fla. 2024); *Shaw v. Set Enterprises, Inc.*, 241 F.Supp. 3d 1318, 1322 (S.D. Fla. 2017)).

By contrast, Streamate does not dictate rates (besides minimum floor rates); Streamate does not restrict a performer's right to work on other platforms; Streamate does not dictate when a performer uses the platform; Streamate does not dictate the location where a streamer performs; and Streamate does not dictate the specific

equipment that a performer must use to connect to the platform or use for their performances. Rekevics Decl. at ¶ 7-8.

    4.    <u>Performers subject to arbitration agreements and collective action waivers should not receive collective action notice</u>.

As noted above, from April 1, 2020 to September 14, 2021, Streamate's Performer Agreement contained a ***mandatory arbitration clause*** for all claims related to the Performer Agreement and included a collective action waiver. Rekevics Decl. at ¶ 10. Therefore, any Florida-based performers who accepted a Performer Agreement between April 1, 2020 and September 14, 2021, and did not thereafter agree to an updated agreement, must bring any claims related to the Performer Agreement exclusively as an individual in arbitration.

Ms. Mondello accepted a Performer Agreement, which does not contain a mandatory arbitration clause or collective action waiver. Accordingly, Ms. Mondello is not similarly situated to any performers who are subject to the mandatory arbitration clause. For these reasons, if this Court decides to authorize notice to putative collective action members, it should ***not authorize notice to individuals who are parties to Performer Agreements with arbitration clauses and collective action waivers***. *See Tidwell v BWW Southern Management, Inc.*, 2023 WL 11762872 (N.D. Fla. Sept. 5, 2023) ("I would not allow notifying those servers who agreed to arbitrate wage disputes [because] they are not similarly situated to servers … who … did not sign an agreement"). Alternatively, Defendants request that this

Court authorize a notice that informs potential opt-in plaintiffs that one version of the Performer Agreement contains an arbitration provision and those performers who signed that version may be precluded from opting in. *See Harris v. Pro. Staffing-A.B.T.S., Inc.*, No. 4:09-CV-59, 2009 WL 10664798, at *6 (N.D. Ga. Oct. 1, 2009).

**D.    Plaintiff's Proposed Notice is Premature and Defendants are Entitled to Object If and When a Collective is Certified**.

Defendants submit that conditional certification and the dissemination of notice are not warranted in this case. However, if this Court decides to conditionally certify the putative collective action and authorizes notice, Defendants object to the Notice proposed by Plaintiff's attorneys (ECF No. 33-2) and the manner in which Plaintiff's attorneys propose issuing the notice. Plaintiff has not conferred with Defendants on the proposed notice and Plaintiff's submission of the notice is premature, both because she has not conferred, and because the notice proceeding typically progresses separately if and when a collective is certified. *Campo v. Granite Services International, Inc.,* 584 F. Supp. 3d 1337, 1351 (N.D. Ga. 2022) (after the court grants a motion to certify a collective, the court then "directs the parties to meet and confer for the purpose of preparing a joint proposed notice to potential collective members"). Defendants are entitled to object to the proposed notice and the court typically holds separate briefing and hearings on the notice. *See*

ECF No. 33-2. Defendants provide a marked copy of the Notice, attached as Exhibit H to the Declaration of Michael Kitson, of changes that should be made.

## IV.  CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Conditional Certification because (1) Plaintiff has not demonstrated that other performers desire to join the putative collective; and (2) Plaintiff cannot establish that she is "similarly situated" to other Florida performers.

DATED:  November 1, 2024

                        LANE POWELL PC


By:  /s/ *Cheryl Wilke*
     Cheryl Wilke
     LEWIS BRISBOIS
     110 S.E. 6th Street, Suite 2600
     Ft. Lauderdale, FL 33301
     Telephone: 954.495.2220
     Cheryl.Wilke@lewisbrisbois.com

     Michael T. Kitson, WSBA No. 41681
     (*admitted pro hac vice*)
     Shirley S. Lou-Magnuson, WSBA No. 52112 (*admitted pro hac vice*)
     Hannah Ard, WSBA No. 40362 (*admitted pro hac vice*)
     1420 Fifth Avenue, Suite 4200
     P.O. Box 91302
     Seattle, Washington 98111-9402
     Telephone:  206.223.7000
     kitsonm@lanepowell.com
     loumagnusons@lanepowell.com
     ardh@lanepowell.com

Attorneys for Defendants ICF Technology, Inc. and Accretive Technology Group, Inc.